**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

MARK A. SCHILLING and ZELENE
M. SCHILLING,

       Defendants.

No. C05-3016-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT**

———————————

**TABLE OF CONTENTS**

**I. INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    **A. Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        **1.   Undisputed Facts** . . . . . . . . . . . . . . . . . . . . . . . . 3
        **2.   Disputed Facts** . . . . . . . . . . . . . . . . . . . . . . . . . 11
    **B. Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**II. LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    **A. Standards For Summary Judgment** . . . . . . . . . . . . . . . . . . . . 15
    **B. Arguments Of The Parties** . . . . . . . . . . . . . . . . . . . . . . . . . 17
        **1.   The plaintiff's argument in support of summary judgment** . . 17
        **2.   The defendants' arguments in resistance** . . . . . . . . . . . . 18
    **C. Choice Of Law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    **D. Interpretation & Construction Of Contractual Provisions** . . . . . . . . 23
        **1.   Applicable rules** . . . . . . . . . . . . . . . . . . . . . . . . 23
        **2.   Interpretation and construction of the pertinent terms** . . . . 25
    **E. Mutual Mistake** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
        **1.   General mistake principles** . . . . . . . . . . . . . . . . . . 28
        **2.   Application** . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    **F. Misrepresentation And Unilateral Mistake** . . . . . . . . . . . . . . . . 32

        *1.*      *General principles* . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        *2.*      *Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

With nearly as much trepidation as Frodo must have felt when he embarked on his journey to Morodor,[1] this federal court begins its ascension up a similarly foreboding, albeit "legal," summit arising out of a land dispute between the United States and its Agency, the United States Department of Agriculture, Farm Service Agency (hereinafter "FSA") and the defendants, Mark A. and Zelene M. Schilling (hereinafter "the Schillings"). Much like the power of the Ring carried by Frodo, which caused all who touched it to desire to possess it, both parties in this land dispute claim an ownership interest in a certain section of farm property. The court cannot retreat from parsing out the interests involved, as did Frodo, who solved the dilemma created by the

---

[1] This reference comes from J.R.R Tolkien's three-part epic story, *The Lord of the Rings*. *See generally* Tolkien, J.R.R., *The Lord of the Rings* (HarperCollinsPublishers 2004) (1954). The book is based on the legend of the Rings of Power. *Id.* According to the story, in ancient times, the Rings of Power were crafted by the Elven-smiths, and Sauron, the Dark Lord, forged the One Ring, filling it with his own power so that he could rule all the others. *Id.* But the One Ring was taken from him and remained lost for many years. *Id.* After much time, the One Ring fell, by chance, into the hands of an adventurous hobbit, Bilbo Baggins. *Id.* When Bilbo reached his eleventy-first birthday, he disappeared, bequeathing to his young cousin, Frodo Baggins, the Ruling Ring and a perilous quest: to journey deep into the shadow of Sauron and destroy the Ring by casting it into the Cracks of Doom. *Id.* The power of the One Ring was so great, however, that anyone who touched it desired to possess it, although hobbits, such as Frodo and Bilbo, were somewhat more resilient to its awesome power. *Id.*

Ring by throwing it into the fiery depths of the Cracks of Doom from which it was created and destroying it. Accordingly, the court will proceed to determine whether the FSA is entitled to summary judgment in this matter, over the defendants' zealous objections.

## I. INTRODUCTION

This controversy primarily concerns whether the FSA has a valid mortgage and lien on a certain tract of land that was purchased by the Schillings on contract from Donald D. Barkema and Cheryl L. Barkema (hereinafter the "Barkemas"). The plaintiff has filed a motion for summary judgment, requesting that this court enter an order declaring that the FSA has a valid secured interest in the parcel of property in dispute. The defendants have resisted, arguing that summary judgment is not appropriate because certain factual disputes exist that cannot be resolved as a matter of law. The court will proceed to set forth the factual and procedural underpinnings that have occurred during the course of this dispute between the parties.

### A. Factual Background

The core undisputed facts and sufficient detail of the disputed facts are set forth below to put in context the parties' arguments for and against summary judgment.

#### 1. Undisputed Facts

The Schillings are residents of Cerro Gordo County, Iowa. Beginning in 1993, the Schillings began borrowing money from the FSA. Ultimately, they obtained five loans from the FSA. Each of these five loans were secured by real estate and chattel property. Specifically, on February 19, 1993, the Schillings granted a mortgage to the FSA involving the following described real estate:

> Beginning at the Southwest Corner of the Southeast Quarter

> (SE¼) of Section Nine (9), Township Ninety-Four (94) North,
> Range Twenty-Two (22) West of the 5th P.M., Cerro Gordo
> County, Iowa; thence North 0°10' 34" East 440.0 feet along
> the West line of the Southeast Quarter (SE¼) of said Section
> 9; thence 990.0 feet parallel with the South line of the
> Southeast Quarter (SE¼) of said Section 9; thence South 0°10'
> 34" West 440.0 feet parallel with the West line of the
> Southeast Quarter (SE¼) of said Section 9 to the South line of
> the Southeast Quarter (SE¼) of said Section 9; thence West
> 990.0 feet along to the South line of the Southeast Quarter
> (SE¼) of said Section 9 to the point of beginning, containing
> 10.00 acres subject to road right-of-way easements of record.

(hereinafter "Section 9 tract"). For reasons that are not entirely clear from the record, the Schillings granted additional mortgages on the same Section 9 tract to the FSA on March 31, 1994 and February 23, 1996. These mortgages indicated the FSA's interest was secondary to a prior mortgage held by Clear Lake Bank and Trust and also subject to the previously described prior mortgages held by the United States of America.

In June of 1996, the Schillings purchased two tracts of land from the Barkemas. First, the Schillings purchased a small acreage, which was included as part of a refinanced mortgage with the Section 9 tract (hereinafter "Section 31 acreage"). Additionally, the Schillings purchased a small farm. This particular real estate purchase was "on contract," and a land contract was drawn up between the Barkemas, as sellers, and the Schillings, as purchasers (hereinafter "Barkema land contract"). The Barkema land contract described the property purchased as follows:

> Northeast Quarter (NE 1/4) of Section Thirty-One (31) in
> Township Ninety-Four (94) North, Range of Twenty-Two (22)
> West of the 5th P.M., except a tract described as beginning 33
> feet North of the Northeast Corner of Block Six (6) in Kaus'
> First Addition to the Town of Kausville, now a part of the
> Town of Meservey, Iowa, thence North 150 feet, thence West
> 140 feet, thence South 150 feet, thence East 140 feet to the

point of beginning, and except the West 100 Acres thereof, AND

A Tract of land in the Northeast Quarter (NE 1/4) of the Southeast Quarter (SE 1/4) of Section Thirty-One (31) in Township Ninety-Four (94) North, Range Twenty-Two (22) West of the 5th P.M., described as commencing at the Northwest Corner of Block Five (5) in Kaus' First Addition to Kausville, now a part of the Town of Meservey, Iowa, thence West 333 feet, thence North to the North line of said NE 1/4 of the SE 1/4, thence East 333 feet, thence South to the place of beginning; AND

Lots Eight (8), Nine (9), Ten (10), Eleven (11) and Twelve (12) in Block Six (6) in K. H. Kaus; First Addition to the town of Kausville, now a part of the Town of Meservey, Iowa.

EXCEPT a tract to the Northeast Quarter (NE 1/4) of Section Thirty-One (31), Township Ninety-Four (94) North, Range Twenty-Two (22) West of the 5th P.M., Iowa, described as commencing at the Southeast Corner of the NE 1/4 of said Section 31, thence N 00°00'00 " E 150.00 feet along the East line of said NE 1/4 to the point of beginning thence continuing N. 00°00'00" E 315.20 feet along the East line of said NE 1/4, thence N 90°00'00" W 568.73 feet, thence S 00°00'00" W 347.20 feet parallel with the East line of NE 1/4 thence S 90°00'00" E 293.00 feet, thence S 00°00'00" E 95.00 feet parallel with the East line of said NE 1/4, thence S 90°00'00" E 101.13 feet, thence N 00°00'00" E 127.00 feet parallel with the East line of said NE 1/4, thence S 90°00'00" E 174.50 feet to the point of beginning.

*See Barkema Real Estate Contract*, Defendants' Exhibit C, at 41 (hereinafter "Section 31 farm").

In 1997, the Schillings applied for loan restructuring from the FSA. The loan restructuring was effectuated pursuant to 7 C.F.R. § 1951.910, which required the

Schillings to provide certain other assets for additional security of the FSA debt.[2]  The

Schillings received a notice of the regulatory requirements applicable to the loan

---

[2] Section 1951.910(b) of Title seven of the Code of Federal Regulations states as follows:

(b)Lien on certain assets. Delinquent borrowers must pledge certain assets, essential and nonessential, unencumbered to the Agency as security at the time FLP loans are restructured, as follows:

(1) The best lien obtainable will be taken on all assets owned by the borrower. When the borrower is an entity, the best lien obtainable will be taken on all assets owned by the entity, and all assets owned by all members of the entity. Different lien positions on real estate are considered separate and identifiable collateral.

(2) Security will include, but is not limited to, the following: land, buildings, structures, fixtures, machinery, equipment, livestock, livestock products, growing crops, stored crops, inventory, supplies, accounts receivable, certain cash or special cash collateral accounts, marketable securities, certificates of ownership of precious metals, and cash surrender value of life insurance.

(3) Security will also include assignments of leases or leasehold interests having mortgageable value, revenues, royalties from mineral rights, patents and copyrights, and pledges of security by third parties.

(4) The exceptions set forth in § 1941.19(c) of subpart A of part 1941 of this chapter apply.

(5) These assets will be considered as additional security for the loans as well as any shared appreciation agreement. The value of the essential assets will not be included in the NRV calculation to determine restructuring. The Agency's lien will be taken only at the time of closing the restructured FLP loans.

7 C.F.R. § 1951.910 (b).

restructuring and submitted to the FSA a signed acknowledgment stating that such notice had been so provided on April 4, 1997. In section II, paragraph (2), in accordance with the applicable C.F.R. provision, the notice informed the reader as follows: "You must agree to give FSA a lien on certain other assets for additional security for the FSA debt. If you are offered restructuring and accept the offer, you must provide this lien at closing."

In order to effectuate the restructuring, the Schillings submitted a Request for Obligation of Funds. The second page of the Schillings' request contained a certification approval. The certification approval, signed by Dennis C. Carlson, the Ag Credit Manager, stated the following in line 44:

> 44. COMMENTS AND REQUIREMENTS OF CERTIFYING OFFICIAL This is $75,280 1 year loan at 5% limited resource for annual operating expenses. Subject to delivery & sale of all corn less 2,000 bu. for feed. *Subject ot [sic] obtaining the best lien obtainable on all real estate as part of the restructuring plan.* Subject to the receipt of $8,000 to make the $37,000 check good. Subject to obtaining a satisfactory written agreements with Farm Service & Farmers Coop.

Request For Obligation Of Funds, Plaintiff's Exhibit F, at 2 (emphasis added). Subsequent to this request, on April 23, 1997, the Shillings executed four promissory notes with the FSA promising to pay the following principal sums to the United States of America: (1) $45,038.06; (2) $46,861.49; (3) $35,010.25; and (4) $36,290.00. *See generally Promissory Notes*, Plaintiff's Exhibits G, H, and I. On this same date, the Schillings granted a mortgage to the FSA as required by the certification approval. The mortgage document indicates that, "in consideration of the loans, and as security for future loans," the Schillings mortgaged the following property:

> Beginning at the Southwest Corner of the Southeast Quarter (SE¼) of Section Nine (9), Township

Ninety-Four (94) North, Range Twenty-Two (22) West of the
5th P.M., Cerro Gordo County, Iowa; thence North 0°10' 34"
East 440.0 feet along the West line of the Southeast Quarter
(SE¼) of said Section 9; thence 990.0 feet parallel with the
South line of the Southeast Quarter (SE¼) of said Section 9;
thence South 0°10' 34" West 440.0 feet parallel with the West
line of the Southeast Quarter (SE¼) of said Section 9 to the
South line of the Southeast Quarter (SE¼) of said Section 9;
thence West 990.0 feet along to the South line of the Southeast
Quarter (SE¼) of said Section 9 to the point of beginning,
containing 10.00 acres subject to road right-of-way easements of record.

Subject to a first mortgage held by Northwest Federal Savings
Bank filed July 3, 1996, Instrument 9606041 in Cerro Gordo
County, Iowa.

Subject to a second, third, fourth and fifth mortgage held by
Farm Service Agency (formerly known as Farmers Home
Administration) for the United States of America filed
February 29, 1996, Instrument 9601404 in Cerro Gordo
County, Iowa

Subject to a contract held by Donald D. Barkema and Cheryl
L. Barkema, Husband and wife, filed on June 26, 1996
Instrument 9605689 in Cerro Gordo County, Iowa. See
Exhibit A.

*Real Estate Mortgage for Iowa*, Plaintiff's Exhibit M, at 2. Attached to the mortgage, as

Exhibit A, is the Barkema land contract for the Section 31 farm, which includes a legal

description of the farm.

In 1998, the Schillings again applied for loan restructuring from the FSA. As was

the case in 1997, the Schillings were provided with notice of the applicable federal

regulations and submitted a signed acknowledgment of that notice dated April 22, 1998.

*Acknowledgment of Notice of Program Availability*, Plaintiff's Exhibit E. Also on April

22, 1998, the Schillings executed another promissory note in the amount of $42,281.00.
The 1998 mortgage document was virtually identical to the 1997 mortgage document and
listed the mortgaged property as follows:

> Beginning at the Southwest Corner of the Southeast Quarter
> (SE¼) of Section Nine (9), Township Ninety-Four (94) North,
> Range Twenty-Two (22) West of the 5th P.M., Cerro Gordo
> County, Iowa; thence North 0°10' 34" East 440.0 feet along
> the West line of the Southeast Quarter (SE¼) of said Section
> 9; thence 990.0 feet parallel with the South line of the
> Southeast Quarter (SE¼) of said Section 9; thence South 0°10'
> 34" West 440.0 feet parallel with the West line of the
> Southeast Quarter (SE¼) of said Section 9 to the South line of
> the Southeast Quarter (SE¼) of said Section 9; thence West
> 990.0 feet along to the South line of the Southeast Quarter
> (SE¼) of said Section 9 to the point of beginning, containing
> 10.00 acres subject to road right-of-way easements of record.
>
> Subject to a first mortgage held by Northwest Federal Savings
> Bank filed July 3, 1996, Instrument 9606041 in Cerro Gordo
> County, Iowa.
>
> Subject to a second, third, fourth and fifth mortgage held by
> Farm Service Agency (formerly known as Farmers Home
> Administration) for the United States of America filed
> February 29, 1996, Instrument 9601404 in Cerro Gordo
> County, Iowa
>
> Subject to a contract held by Donald D. Barkema and Cheryl
> L. Barkema, Husband and wife, filed on June 26, 1996
> Instrument 9605689 in Cerro Gordo County, Iowa. See
> Exhibit A *for the Legal Description*.

*Real Estate Mortgage for Iowa*, Plaintiff's Exhibit L, at 2 (emphasis added). The only
difference between the 1997 mortgage document and the 1998 mortgage document is the
addition of the words "for the Legal Description" to the last sentence of the 1998

9

mortgage. Both the 1997 and 1998 mortgages were filed and recorded in the Cerro Gordo County Recorder's Office.

Ultimately, the Schillings were unable to meet their obligations under the FSA mortgage. Consequently, in 2003, the Schillings again applied for primary loan servicing. This time, the Schillings' application was denied. Instead, in accordance with 7 C.F.R. § 1951.909(h)(4), the FSA proposed a loan buyout offer, often referred to as "net recovery buyout," under which the Schillings could buyout their FSA loans at the lesser of either the current market value of the mortgaged property or their unpaid FSA debt. At the time the FSA offered net recovery buyout to the Schillings, their debt exceeded the current market value of the property at issue. As such, the Schillings' requisite buyout amount turned upon the current market valuation of the mortgaged property. The Schillings initially requested to buyout their FSA loans for approximately $65,000.00 to $68,000.00. The amount of the Schillings' offer was calculated by utilizing the value of tract 9, less any remaining debt. The FSA declined this offer. Instead, the FSA calculated the net recovery buyout at approximately $141,604.00, which is the value of tract 9 and the section 31 farm, less any remaining debt. The FSA's declination of the Schillings' offer and subsequent calculation of the net buyout recovery amount led to the current dispute between the parties regarding whether the section 31 farm should be included as part of the buyout.

With respect to the 1997 and 1998 mortgages, the Cerro Gordo County Recorder did not initially index the section 31 farm abstract in 1997. In the fall of 2003, the Cerro Gordo County Recorder did add two legal descriptions to the computer and track books, indicating that the FSA had a mortgage on the section 31 farm. However, the recorder made this addition based on a conversation with the FSA, in which the FSA represented that there was no dispute over the validity of the mortgage on the section 31 farm. This

action was thereafter reversed in 2004, after the recorder was informed the Schillings did indeed dispute the validity of the mortgage and did not intend to grant the FSA a lien on the section 31 farm. However, the recorder again reversed its decision that same year and re-indexed the section 31 farm. The section 31 farm has continuously been indexed since August 25, 2004.

### 2. *Disputed Facts*

There are primarily only two core facts largely in dispute between the parties, both of which are somewhat interrelated and mutually dependent upon each other. First, the parties dispute whether the FSA has a valid lien on the section 31 farm property. The Schillings deny that they have, or ever intended to, grant the FSA a lien on the section 31 farm. The FSA, however, contends that the rules and regulations governing the loan restructuring applied for by the Schillings clearly demonstrate that the Schillings were required to grant the FSA a mortgage over the section 31 farm. Further, although the promissory note and corresponding mortgage documentation admittedly lack a certain degree of clarity, taken together with the regulations, the FSA contends the validity of the mortgage on the section 31 farm property is undeniable. In contrast, the Schillings aver the FSA represented to Mark Schilling that, because the section 31 farm was purchased on a land contract, it would not be included as part of the 1997 FSA mortgage. The Schillings assert they owned a second property, also purchased on land contract, which was left out of the 1997 FSA mortgage for that same reason. The Schillings contend they signed the 1997 mortgage with this mutual understanding and that both parties intended to grant a mortgage on the section 31 acreage, and not the section 31 farm property referenced in the 1997 and 1998 mortgages.

Second, and as a direct result of the parties' dispute over the validity of the FSA's purported mortgage on the section 31 farm property, the parties in turn dispute the

calculation of the net recovery buyout amount. The Schillings argue that the net recovery buyout should be calculated at approximately $64,013.00, which does not include the value of the section 31 farm property. In stark contrast, the FSA avers net recovery buyout should be calculated at approximately $141,604.00, which includes the value of the section 31 farm property.

The applicable facts and nuances to the parties' arguments will be discussed more in detail, if warranted, in the legal analysis of the plaintiff's claims below. Suffice it to say, the Schillings assert the plaintiff never obtained a valid mortgage on the section 31 farm tract, and that, therefore, the net recovery buyout should not be calculated including the value of this parcel of real property. In contrast, the plaintiff argues the mortgage over the section 31 farm tract is valid, and consequently, that the section 31 farm should be taken into account when calculating the cost of the net recovery buyout.

## B. *Procedural Background*

As detailed in the previous factual background, the FSA determined the Schillings' debt exceeded the market value of the security for the debt and offered the Schillings the opportunity to buy out their debt for the market value of the security. The FSA valued this amount at $141.604.00. The Schillings, however, disputed the FSA's inclusion of the Section 31 farm as part of the buyout value. Rather, the Schillings contended their net recovery buyout should be valued at approximately $64,013.00. Following the rejection by the FSA of the Schillings' offer and subsequent demand of $141,604.00, the Schillings appealed the FSA's final decision to the National Appeals Division (NAD).[3] A Hearing

---

[3]The NAD is an adjudicative appeals division that was established in 1994 to hear and determine appeals of adverse decisions by certain USDA agencies. *See* 7 U.S.C.

(continued...)

Officer Determination was issued by James R. Hoffman, the Hearing Officer, on January 2, 2004. The Hearing Officer Determination ultimately concluded that the inclusion of the Section 31 farm property in the buyout value was "premature," and therefore, in error, at least until the validity of the FSA lien was affirmatively resolved. Such a determination fell outside the scope of a NAD appeal hearing and was, consequently, neither resolved nor addressed by the hearing officer. Neither party requested a NAD Director's review of the January 2, 2004, Hearing Officer Determination.

On March 23, 2004, the FSA again denied the Schillings primary loan servicing and offered a net recovery buyout at $141,604.00, which, as before, included the value of the Section 31 farm. Following this determination by the FSA, the Schillings appealed to the NAD a second time, on June 30, 2004. A Hearing Officer Determination was issued by Michael W. Shea, the Hearing Officer, on June 30, 2004. He determined that the Hearing Officer Determination of January 2, 2004, adjudicated the same claims and involved the same parties and that the decision had become final in the absence of a timely request by either party for a Director's review. Thus, the Hearing Officer determined that the NAD was precluded by res judicata principals from reviewing the January 2, 2004, Hearing Officer Determination. The FSA then sought a Director's review, who likewise determined that he was precluded from revisiting the matter further.

Consequently, on April 1, 2005, the FSA filed a three-count complaint with this court. In Count 1, the plaintiff seeks declaratory relief with respect to the validity of the FSA's lien on the Section 31 farm property. Alternatively, in Counts 2 and 3, the plaintiff seeks reformation of the parties' mortgage to include the Section 31 farm property. On June 27, 2005, the Schillings filed an answer to the plaintiff's complaint, generally denying

---

[3](...continued)
§§ 6991-6999.

that the Section 31 farm was included in the FSA mortgage and requesting this court to determine the FSA's lien was invalid. Additionally, the Schillings raised a counterclaim, seeking an order from this court requiring the FSA to implement the final NAD decision in this matter and process the Schillings' restructuring application by excluding the value of the Section 31 farm from the net recovery buyout value. On July 7, 2005, the plaintiff filed its answer to the defendants' counterclaim, generally denying all the allegations therein. On June 5, 2006, the plaintiff filed the current Motion For Summary Judgment (Doc. No. 23), requesting that this court declare the validity of the FSA lien on the Section 31 farm property purchased by the Schillings on contract from the Barkemas. The defendants filed their resistance thereto on June 29, 2006.

The court heard oral argument on the plaintiff's Motion For Summary Judgment on August 21, 2006. At the August 21, 2006, hearing, the United States of America was represented by Martha A. Fagg, Assistant United States Attorney. The Schillings were represented by Joseph G. Basque of Iowa Legal Aid in Council Bluffs, Iowa. As the matter is now fully submitted and the court is now in a position to make its determination, the court will proceed to issue its decision pursuant to the parties' request.

## II.  LEGAL ANALYSIS

The court will now turn its attention to a brief survey of the standards applicable to the plaintiff's motion for summary judgment, then to the application of those standards to the critical issues involved in this case.

## A.  Standards For Summary Judgment

The parties here agree generally on the standards applicable to a motion for summary judgment.  Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party.  *Fed. R. Civ. P.* 56(b).  "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Fed. R. Civ. P.* 56(c).  As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial.  *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990).  In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377.  Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue."  *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME*

*Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P.* 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," i.e., are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

Finally, this court notes that summary judgment is particularly appropriate, in a case such as the one currently before the court, "'[w]here the unresolved issues are primarily legal rather than factual . . . .'" *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402,

1405-06 (8th Cir. 1990)).  The court will apply these standards to the plaintiff's Motion For Summary Judgment.

## B. Arguments Of The Parties

### 1.    The plaintiff's argument in support of summary judgment

The plaintiff contends that although the 1997 and 1998 mortgages admittedly could have been more "artfully drafted," the specific language of the real estate contracts, construed in light of the context in which the mortgages were drafted, demonstrates that the parties intended to include the Section 31 farm tract as security for the restructuring of the Schillings' loans.  The plaintiff points out that the 1997 mortgage includes a description of the Section 9 property, then indicates that the mortgage was subject to a first lien held by Northwest Federal Savings Bank; a second, third and fourth mortgage held by the FSA; and subject to the land contract between the Schillings and the Barkemas.  The description included the recording information for the Barkema contract and attached said contract as an exhibit to the mortgage.  The 1998 mortgage included virtually identical language, pointing whomever perused the contract to "Exhibit A," which again was the Barkema land contract, for the legal description.  Based on these facts, the plaintiff argues that the inclusion of the phrase "subject to the land contract" implies that the FSA obtained an interest in the property covered by that contract—the Section 31 farm tract.  This is so, avers the plaintiff, because the language "subject to" indicates that the FSA's interest in the property is inferior to the Barkemas.  In order for the FSA's interest to be considered "inferior," to the titleholders' interest, it must actually have an interest in the property in question.  The plaintiff argues that a contrary interpretation would render this particular clause and attached legal description completely superfluous.

The plaintiff further contends that the language of the contract is not ambiguous and

that the Schillings have failed to offer any reasonable alternative interpretation of the language and that, as such, the court need not consider extrinsic evidence, and that summary judgment is proper because the contract is only susceptible to one interpretation—that the FSA has a valid lien on the Section 31 farm property. However, should this court find the 1997 and 1998 mortgages to be ambiguous, the plaintiff proffers that the circumstances surrounding the formation and execution of the mortgages in dispute clearly demonstrate that the parties intended to grant the FSA a security interest in the Section 31 farm tract. The plaintiff illuminates the fact that federal regulations require delinquent borrowers seeking restructuring to provide a security interest in any collateral not already pledged to the government and that the Schillings were provided with copies of the relevant regulatory provisions before they even applied for loan assistance. As such, even if the court determined the 1997 and 1998 mortgages were ambiguous in nature based on the plain meaning of the terms used therein, the plaintiff avers summary judgment is still proper because the context and circumstances surrounding the execution of the 1997 and 1998 mortgages indicates the FSA has a valid lien on the section 31 farm tract.

### 2. *The defendants' arguments in resistance*

The Schillings first argue that, by the plaintiff's own admission, the 1997 and 1998 mortgages lack clarity. As such, the intent of the parties is relevant in determining the meaning of the mortgages in question. Accordingly, the defendants argue that summary judgment is not appropriate because the intent of the parties is clearly a factual issue in dispute.

With respect to the alleged ambiguous nature of the 1997 and 1998 mortgages, the defendants highlight the fact that the Cerro Gordo County Recorder originally did not index either mortgage because the "language did not appear to grant [the FSA] any interest in the Barkema contract land." *See Letter from Michael G. Byrne to Dave Lawler* of Nov.

26, 2003, Defendants' Exhibit D, at 1. Although that initial determination was reversed, based upon a conversation with the Department of Agriculture, in 2003, the recorder again reverted back to its initial determination after learning the Schillings disputed the validity of the FSA's purported lien on the Section 31 farm property. The Schillings point to this evidence to support the ambiguous nature of the contracts. Stated differently, the defendants aver that because the Cerro Gordo County Recorder did not consider the FSA mortgage to create a lien on the Section 31 farm, the FSA cannot establish a clear lien on the section 31 farm as a matter of law. The Schillings attempt to bolster their argument by relying on an attorney's real estate title examination conducted in 2003. As part of the administrative buyout dispute, the Schillings hired Michael Bryne, an attorney in Mason City, Iowa, to conduct a real estate title examination limited to liens against the land contract through which the Schillings purchased the Section 31 farm. Mr. Bryne concluded that the FSA did not have a lien against any land described in the Barkema contract. Thus, the Schillings argue the 1997 and 1998 mortgages are clearly ambiguous. As such, the Schillings contend the intent of the parties must be taken into account in order to interpret the parties' agreements. This, the Schillings contend, the court cannot do in a motion for summary judgment because it concerns a factual dispute.

The Schillings acknowledge that there was a reason for the reference to the Barkema property in the 1997 and 1998 mortgages. In contrast to the plaintiff's allegations, however, the Schillings contend the Section 31 *acreage*, not the Section 31 *farm*, was actually intended as security and that was the true reason underlying the reference to the Barkema property. The Schillings assert the FSA not only failed to adequately list the legal description in order to effectuate a valid lien, but also that the FSA failed to make reference to the proper Barkema property that was intended to be mortgaged. Because the FSA drafted the 1997 and 1998 mortgages, the Schillings aver the contracts should be

construed against the drafter, in this case, the FSA. In addition, the Schillings argue that taking the circumstances into account, it is more probable that the parties intended to include the Section 31 acreage as part of the security and not, as the FSA avers, the Section 31 farm. This is so, argue the Schillings, because the Section 31 acreage was part of the same mortgage as the Section 9 tract. In addition, both the Section 9 tract and the Section 31 acreage were subject to a first mortgage by Northwest Federal Savings Bank. It would have been more advantageous at the time the mortgages were executed, at least according to the Schillings, for the FSA to take an interest in the Section 31 acreage, rather than the Section 31 farm, because a land contract can be foreclosed upon within thirty days of a missed payment. Thus, according to the Schillings, the intent of both parties was to include the Section 31 acreage in the 1997 and 1998 mortgages, not the Section 31 farm, as the FSA alleges. As such, the Schillings contend the plaintiff's motion for summary judgment should be denied in its entirety.

## C. Choice Of Law

Although the parties did not raise the issue, evidently implicitly agreeing that Iowa law controls, the first question the court must address is what law controls the interpretation of the mortgages and promissory notes executed in 1997 and 1998. While the present action is one brought under federal law, the applicable federal statutes and regulations contain no substantive rules for contract interpretation. As such, state contract law governs the question. *See Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981) (noting that the vesting of jurisdiction in a federal court does not, in and of itself, give rise to formulate federal common law); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979) (noting that the fact that an action arises under the laws of the United States does not necessarily mean that federal law supplies the ultimate rule of decision);

*see also Lyster v. Ryan's Family Steak House, Inc.*, 239 F.3d 943, 945-46 (8th Cir. 2001) (applying state contract principles to an arbitration agreement under the Federal Arbitration Act); *United States v. Henke Constr. Co.*, 157 F.2d 13, 24 (8th Cir. 1946) (noting that while the present action was brought under the Miller Act, it was in the nature of an action on contract and that the construction of the federal statute was not involved; thus, state law applied pursuant to the principles enunciated in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Were this a diversity case, *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487 (1941), would require that we look to the choice of law doctrines of the forum state in order to determine which state's substantive law is applicable to the controversy. However, this is a federal question case, brought pursuant to the court's jurisdiction under 28 U.S.C. § 1331, and consequently, the analysis becomes slightly more muddled.

Generally, it is appropriate to apply a federal common law choice of law rule in order to decide which jurisdiction's substantive law should govern in federal question cases. *See Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 120-21 (2d Cir. 1984). However, the fact that federal courts are not compelled to apply state choice of law principles in federal question cases does not preclude a court from relying on state law if the doing so would best effectuate Congress's overall intent. *See Kimbell*, 440 U.S. at 728 (noting that state law may be incorporated as the federal rule of decision in federal question cases). The Eighth Circuit acknowledged this principle in *United States v. Henke Construction Co.* 157 F.2d at 24. There, although the action was brought under the Miller Act, 40 U.S.C. §§ 270a, 270b, & 270c, the court determined the action was primarily an action on contract and applied the principles set forth in *Erie* and *Klaxon* in selecting which law was applicable. *Id.* Here, a similar situation exists. Although the present action arises under federal laws and regulations, the general premise of the action

21

is in the nature of an action on contract and the construction of the federal statute is not involved. As the Fifth Circuit has noted:

> When, as in this case, extensive federal legislation and regulation exist in the area but do not directly address the precise and narrow issue of litigation, the pertinent analysis assesses whether there exists a valid and substantial federal interest or policy that requires the application of federal law as an exercise of interstitial lawmaking to protect or to effectuate the federal scheme. When no such federal interest or policy exists, *Erie* requires that state law apply. *First Southern Federal Savings & Loan Association v. First Southern Savings & Loan Association*, 614 F.2d 71, 73 (5th Cir. 1980).

*Wayne v. Tenn. Valley Auth.*, 730 F.2d 392, 397 (5th Cir. 1984). As was the case in *Henke*, this court concludes that *Erie*, as extended and applied in the *Klaxon* case is applicable here. Thus, this court will apply the forum state's choice-of-law rules in order to ascertain which substantive law is applicable.[4] Iowa law employs the Second Restatement's "most significant relationship" test to determine which state's law will govern a contract's interpretation. *See Walker v. State Farm Mut. Auto. Ins. Co.*, 973 F.2d 634, 637 (8th Cir.1992) (recognizing that Iowa had "adopted the Second Restatement of Conflicts as its choice-of-law provision," and that the Second Restatement "applies the law of the state with the most significant interests in the litigation."); *Cole*, 296 N.W.2d 779, 781 (Iowa 1980) (noting that in contract cases "it is clear that choice-of-law questions

---

[4]It is noteworthy that this determination makes virtually no difference in the ultimate resolution of this issue as Iowa choice-of-law rules are substantially similar to the federal choice-of-law rules. For example, Iowa law employs the "most significant relationship test," *see Cole v. State Auto & Cas. Underwriters*, 296 N.W.2d 779, 781 (Iowa 1980), whereas the federal rule requires employment of the law most relevant to the pending controversy, *see In re Crist*, 632 F.2d 1226, 1229 (5th Cir. 1980) (citing 1A Moore's Federal Practice ¶ 0.325, at 3406-13 (2d ed. 1981)); *F.D.I.C. v. Rusconi*, 808 F. Supp. 30, 45 n.25 (D. Me. 1992).

are now to be determined under the *Restatement (Second)* test: intent of the parties or the most significant relationship."). In this instance, the court finds that Iowa has the most significant relationship to the claims at issue in this litigation for the following reasons: (1) the Schillings are residents of Cerro Gordo county, located in Iowa; and (2) the parcels of real property at issue are located in Cerro Gordo county, Iowa; and (3) the Schillings executed both the 1997 and 1998 mortgages in Iowa. *See Restatement (Second) of Conflicts of Laws* § 188 (absent a choice by the parties, court should consider place of contracting, of negotiation, of performance, of contract's subject matter, and parties' domiciles, residences, nationalities, places of incorporation and places of business). As such, the court will proceed to apply Iowa law to the merits of the plaintiff's motion for summary judgment.

### D. Interpretation & Construction Of Contractual Provisions

#### 1. Applicable rules

This court has recognized that Iowa law distinguishes between "interpretation" and "construction" of a contract. *See Kaydon Acquisition Corp. v. Am. Cent. Indus., Inc.*, 179 F. Supp. 2d 1022, 1037 (N.D. Iowa 2001). When the dispute concerns the meaning of certain contract terms, the court must engage in the process of interpretation, rather than construction. *See id.* (citing *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001); *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999), which notes that interpretation is "a process for determining the meaning of words in a contract" while construction is "a process of determining the legal effect of such words"; *Fashion Fabrics of Iowa v. Retail Investors Corp.*, 266 N.W.2d 22, 25 (Iowa 1978), which states, "Interpretation involves ascertaining the meaning of contractual words; construction refers to deciding their legal effect."). As this court has noted,

The Iowa Supreme Court has explained that:

> The primary goal of contract interpretation is to determine the parties' intentions at the time they executed the contract. *See Hartig Drug Co.* [*v. Hartig*], 602 N.W.2d [794,] 797 [ (Iowa 1999) ]. Interpretation involves a two-step process. First, from the words chosen, a court must determine "what meanings are reasonably possible." *Restatement (Second) of Contracts* § 202 cmt. a, at 87 (1981). In so doing, the court determines whether a disputed term is ambiguous. A term is not ambiguous merely because the parties disagree about its meaning. *Hartig Drug Co.*, 602 N.W.2d at 797. A term is ambiguous if, "after all pertinent rules of interpretation have been considered," "a genuine uncertainty exists concerning which of two reasonable interpretations is proper." *Id.* Once an ambiguity is identified, the court must then "choos[e] among possible meanings." *Restatement (Second) of Contracts* § 202 cmt. a, at 87. If the resolution of ambiguous language involves extrinsic evidence, a question of interpretation arises which is reserved for the trier of fact. *Fausel*, 603 N.W.2d at 618; *Walsh*, 622 N.W.2d at 503.

*Kaydon Acquisition Corp.*, 179 F. Supp. 2d at 1037-38. As to "pertinent rules of interpretation," the Iowa Supreme Court has explained that a court should first examine the plain meaning of the term or terms in question. *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991). Second, after examining a term's plain meaning, the term or terms are viewed in the context in which it is used. As the Iowa Supreme court has proclaimed, "We . . . do not interpret [any] contractual term apart from the context of the agreement as a whole. . . . The parties' intent as evidenced by all of the terms of the contract controls our conclusion." *Koenigs v. Mitchell County Bd. of Supervisors*, 659 N.W.2d 589, 594 (Iowa 2003). Additionally, the Iowa Supreme Court has expressed a preference for interpretations that give meaning to all the terms of a contract, as opposed to interpretations that render some terms unreasonable, unlawful,

or superfluous. *DeJong v. Sioux Center, Iowa*, 168 F.3d 1115, 1120 (8th Cir. 1999) (citing *Fashion Fabrics of Iowa, Inc.*, 266 N.W.2d at 26). "Interpretation" is "a question of law for the court unless the meaning of disputed terms turns on extrinsic facts or choices among reasonable inferences." *Grinnell Select Ins. Co. v. Cont'l W. Ins. Co.*, 639 N.W.2d 31, 33 (Iowa 2002).

On the other hand, where the dispute centers on determining the legal effect of contractual terms, the court engages in the process of construction, rather than interpretation. *See Fausel*, 603 N.W.2d at 618; *Fashion Fabrics of Iowa*, 266 N.W.2d at 25. "In the construction of written contracts, the cardinal principle is that the intent of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says." *Iowa R. App. P.* 6.14(6)(n). The Iowa Supreme Court has explained that "construction" is "always a question of law." *See Grinnell Select Ins. Co.*, 639 N.W.2d at 33.

### 2.    *Interpretation and construction of the pertinent terms*

As to the proper interpretation of the 1997 and 1998 mortgage agreements, the court must first determine the plain meaning of the words in the contract. *See Iowa Fuel & Minerals, Inc.*, 471 N.W.2d at 863. The 1997 and 1998 mortgages are substantially similar. In the first paragraph, both mortgages give the legal description of the section 9 tract. The second paragraphs of both documents indicate the FSA's interest is subject to a first mortgage held by Northwest Federal Savings Bank. The third paragraphs of both mortgages indicate the FSA's interest is subject to a second, third, fourth and fifth mortgage held by the FSA. The final paragraphs both indicate the FSA's interest is subject to a contract held by the Barkemas and both reference Exhibit A, which includes the legal description of the section 31 farm property. The only difference between the mortgages is the precise verbiage in which they reference "Exhibit A." The 1997 mortgage simply

states, "See Exhibit A," whereas the 1998 mortgage reads, "See Exhibit A for the Legal Description." From the plain meaning of the words chosen, the only reasonable meaning of the 1997 and 1998 mortgages is that the Schillings granted the FSA a lien over the Section 31 farm property. Standing alone, without consideration of the reference to Exhibit A, the language in the final paragraphs of the two mortgages could indeed be confusing, because the language does not relate to the previously described Section 9 tract. However, the court does not examine that paragraph in isolation of the reference to Exhibit A. Rather, the court's conclusion is controlled by an examination of the contract as a whole. Viewing the contract as a whole, it is clear that the first three paragraphs reference the first tract of real property—the Section 9 tract. The final paragraphs of the 1997 and 1998 mortgages are the only paragraphs that reference Exhibit A within the two documents. Thus, it is apparent that the final paragraphs of the mortgages are the only paragraphs tied to Exhibit A and rely on that exhibit to provide the legal description of the real property—the Section 31 farm property. Thus, the only reasonable interpretation that can be gleaned by this court is that the legal description that relates to the "subject to language" encompassed within the final paragraphs of the 1997 and 1998 mortgages is supplied by Exhibit A and accordingly, is in reference to the Section 31 farm property. In short, the meaning of the final paragraphs in both the 1997 and 1998 mortgages is that the Schillings granted the FSA a lien over the Section 31 farm property, as described in Exhibit A.

Moreover, in the context of the 1997 and 1998 real estate contracts, it would be absurd to conclude that the 1997 and 1998 mortgages included the "subject to language" with respect to the Barkema land contract and referenced Exhibit A, which is the legal description of the land sold under the Barkema land contract, but did not grant the FSA a mortgage over that property. The FSA's interest could not be "subject to" the Barkemas

primary interest unless the FSA had been granted an inferior interest in that same property. A contrary interpretation, as argued by the Schillings, would violate two primary rules of contract construction—first, viewing the terms of the contractual agreement as a whole and second, preferring an interpretation that gives meaning to all the terms of a contract. *See Koenigs*, 659 N.W.2d at 594 (indicating courts should interpret contractual terms from the context of the agreement as a whole); *DeJong*, 168 F.3d at 1120 (noting that Iowa courts prefer an interpretation that gives meaning to all the terms of a contract, as opposed to rendering some terms superfluous). Thus, an examination of the final paragraphs of the 1997 and 1998 mortgages as a whole and in the context of the entire agreement, leads the court to conclude that the terms of the contract are not ambiguous and that the only reasonable interpretation, regardless of their now-expressed intent, is that the Schillings granted the FSA a lien over the section 31 farm property. Although the Schillings claim such an interpretation is in discord with their intent, unless an ambiguity is found, the parties' intent is inferred from the plain meaning of the terms of the written contract viewed as a whole. *DeJong*, 168 F.3d at 1120 (citing *Iowa Fuel & Minerals, Inc.*, 471 N.W.2d at 863). The parties' disagreement as to the meaning of the paragraph in question does not establish ambiguity where no ambiguity otherwise exists. *See Kaydon Acquisition Corp.*, 179 F. Supp. 2d at 1037-38. Because there is no ambiguity, the court need not proceed to the second step in the process of "interpretation," which would require the court to choose among possible meanings, for example, on the basis of extrinsic evidence. *Id.*

Rather, because there is only one reasonable interpretation of the 1997 and 1998 mortgages, the court turns next to "construction" of the contractual terms, which means the determination of their legal effect. *See Fausel*, 603 N.W.2d at 618. Although the parties' intent is once again controlling, where, as here, there is no ambiguity, intent is

"determined by what the contract itself says." *Iowa R. App. P.* 6.14(6)(n). What the pertinent paragraphs of the 1997 and 1998 mortgages say is that the section 31 farm property was included in the mortgage agreements. Thus, the legal effect of the mortgage documents is that the FSA has a valid lien over the section 31 farm property, absent an independent justification for concluding otherwise, such as in the case of fraud or mistake. *See Schlosser v. Van Dusseldorp*, 101 N.W.2d 715, 719 (Iowa 1960) (noting that a person is bound by their signature absent fraud or mistake). Thus, if this court's analysis were to end here, it would be clear that summary judgment in this case would properly be granted to the plaintiff. However, this court cannot make such a determination without first examining the doctrine of mistake and its application to contract law.

### E.  Mutual Mistake

Although not succinctly stated as such, this court's review of the Schillings' argument leads it to believe that what the Shillings are really contending does not boil down to a contract interpretation issue. Rather, an examination of the pleadings in this case and the Schillings' resistance reveal that the crux of their argument is that neither they, nor the FSA, intended to include the section 31 farm property in the 1997 and 1998 mortgages. Indeed, the Schillings represent the FSA assured Mark Schilling that the section 31 farm property would not be included because it was purchased via a land contract. Thus, the Schillings' argument sounds more in mutual mistake than it does in a contract interpretation question. Accordingly, the court will briefly address this claim before making a final disposition on the merits of the plaintiff's motion.

#### 1.  General mistake principles

The Iowa courts examine contract signing with the precept that a person would "hardly sign an important document without reading it." *Schlosser v. Van Dusseldorp*,

101 N.W.2d 715, 719 (Iowa 1960). In the absence of fraud or mistake, a person is bound by their signature. *Id.* Ignorance of the contents of an instrument does not ordinarily affect the liability of one who signs it. *Preston v. Howell*, 257 N.W. 415, 418 (Iowa 1934). "It is also the settled rule of law that if a party to a contract is able to read, has the opportunity to do so, and fails to read the contract, he cannot thereafter be heard to say that he was ignorant of its terms and conditions, for the purpose of relieving himself from its obligation." *Id.* However, if a "mistake," as opposed to a mere oversight, is made by one or both parties, depending on the nature of the mistake, relief may be granted to an aggrieved party. A mistake is a belief that is not in accord with the facts." *Restatement (Second) of Contracts* § 151 (1981). As the Iowa Supreme Court has explained:

> Mistakes involving contracts "can be made in the formation, integration, or performance of a contract." Mistake in expression, or integration, occurs when the parties reach an agreement but fail to accurately express it in writing. Mistakes in the formation of contracts include mistakes in an underlying assumption concerning matters relevant to the decision to enter into a contract. In this category of mistake, the agreement was reached and expressed correctly, yet based on a false assumption.

*State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 151 (Iowa 2001) (citations omitted). When the mistake is in the expression of the contract, the proper remedy is reformation, and "it normally makes no difference if the mistake is mutual or unilateral." *Id.* (citation omitted); *accord Merle O. Milligan Co. v. Lott*, 263 N.W. 262, 263-64 (1935) ("[A] mistake to justify the reformation of a contract must have been in drawing the instrument, and not in making the contract out of which it grew; that is, it must occur in reducing to writing the contract upon which the parties had agreed; and in all cases it must relate to something within the contemplation of the parties in making the contract, to something agreed upon, but not contained in the written contract."); *Restatement (Second) of*

*Contracts* § 155 ("Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement . . . .").

Contrarily, when the mistake is in the formation of the contract, avoidance is the proper remedy. *United States v. Williams*, 198 F.3d 988, 994 (7th Cir. 1999) (citation omitted); *Restatement (Second) of Contracts* § 155 cmt. b; *see also id.* § 202 ("Reformation is the appropriate remedy when the mistake is one as to expression, while voidance is the proper remedy where a mistake as to a basic assumption on which the contract was based has a material effect on the agreed exchange of performances."). Specifically, when a mistake of both parties at the time a contract was made as to a basic assumption upon which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake. *Id.* § 152(1).

### 2. *Application*

In this case, the mistake alleged by the Schillings allegedly occurred in the expression of the contract, not in the formation of the contract. Essentially, taking the facts in a light most favorable to the nonmoving party—in this case, the Schillings—as is required in a motion for summary judgment, both the FSA and the Schillings intended the Section 31 acreage to be included in the 1997 and 1998 mortgages, not the Section 31 farm property. However, the writing that embodied the parties' agreement failed to accurately express the terms agreed upon by the parties. These facts are sufficient to allege a mutual mistake in the expression of the contract and, if proved, would justify reformation of the contract in order to alter the writing to accurately express the parties' agreement.

Importantly, this result is not precluded by the Statute of Frauds.[5]  Section 156 of the Restatement of Contracts indicates that a writing may be reformed before it is subjected to the requirements of the Statute of Frauds.  *Id.* § 156 (noting that if reformation is appropriate, "it is not precluded by the fact that the contract is within the Statute of Frauds.").  Thus, a genuine issue of material fact exists as to whether the parties made a mutual mistake in the embodiment of the 1997 and 1998 mortgages, and whether reformation is required to accurately reflect the terms of the parties' agreement.

---

[5]Iowa's Statute of Frauds is embodied in Iowa Code § 622.32.  Specifically, this section provides:

> Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by the party's authorized agent:
>
> 1. Those made in consideration of marriage.
>
> 2. Those wherein one person promises to answer for the debt, default, or miscarriage of another, including promises by executors to pay the debt of the decedent from their own estate.
>
> 3. Those for the creation or transfer of any interest in lands, except leases for a term not exceeding one year.
>
> 4. Those that are not to be performed within one year from the making thereof.

*Iowa Code* § 622.32.

### F. Misrepresentation And Unilateral Mistake

In addition to alleging facts sufficient to generate a genuine issue of material fact on the issue of mutual mistake in the expression of the 1997 and 1998 mortgages, the Schillings have also averred facts sufficient to defeat the plaintiff's motion for summary judgment with respect to misrepresentation and unilateral mistake. A brief overview of these principles is helpful.

### 1. General principles

Differing slightly from the general principles surrounding the doctrine of mutual mistake are the rules associated with a unilateral mistake. Traditionally, where a mistake as to a basic assumption on which the contract is made is not shared by both parties, courts have been reluctant to allow a party to avoid a contract. *Id.* § 153, cmt. a. Indeed, under Iowa law, the unilateral mistake of one party does not relieve that party from its obligation "absent a showing of fraud, misrepresentation, or other inequitable conduct." *State v. Unisys Corp.*, 637 N.W.2d 142, 150 (Iowa 2001) (citing *Bachman v. Easy Parking of Am., Inc.*, 562 N.W.2d 369 (1997)); *see also Employers Mut. Cas. Co. v. United Fire & Cas. Co.*, 682 N.W.2d 452, 455 (Iowa Ct. App. 2004) (citing *Unisys Corp.*, 637 at 150).[6] An agreement can be either rescinded or reformed because of mistake by one party and fraud or inequitable conduct by the other. *Wellman Sav. Bank v. Adams*, 454 N.W.2d 852, 855 (Iowa 1990). Ultimately, relief in equity will be granted if a document, as written, fails

---

[6] Iowa's approach differs slightly from the approach set forth in the *Restatement (Second) of Contracts*. Under the principles set forth in the *Restatement*, a unilateral mistake of one party makes a contract voidable when either of two circumstances present themselves; first, if the mistake is such that enforcement of the contract would render an unconscionable result and second, if the other party had reason to know of the mistake or caused the mistake. *Restatement (Second) of Contracts* § 153. However, while Iowa's and the Restatement's approach may differ in verbiage, this court notes that the differences in the actual application of these principles is more than likely negligible.

to express the true agreement between the parties. *Sioux County State Bank v. Veenstra*, 372 N.W.2d 309, 312 (Iowa App. 1985).

To recover in an action for fraud, a party must prove: (1) a material misrepresentation; (2) made knowingly; (3) with the intent to induce the plaintiff to act or refrain from acting; (4) justifiable reliance; and (5) damages. *Carlson v. Vondrak*, 555 N.W.2d 238, 241 (Iowa Ct. App. 1996). A misrepresentation is defined in the *Restatement (Second) of Contracts* as "an assertion that is not in accord with the facts." *Restatement (Second) of Contracts* § 159. In turn, a misrepresentation is deemed to be fraudulent or material when one of two situations occur. As the *Restatement (Second) of Contracts* succinctly states:

> (1) A misrepresentation is fraudulent if the maker intends his assertion to induce a party to manifest his assent and the maker
> > (a) knows or believes that the assertion is not in accord with the facts, or
> > (b) does not have the confidence that he states or implies in the truth of the assertion, or
> > (c) knows that he does not have the basis that he states or implies for the assertion.
> (2) A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so.

*Restatement (Second) of Contracts* § 162. Under this section, a fraudulent misrepresentation need not be material in order to entitle a party to relief. *Id*. cmt. c. However, a nonfraudulent misrepresentation will not be sufficient under the law to provide relief to a party unless it is material. *Id*. Thus, if a party can prove his or her manifestation of assent was induced by either a fraudulent or material misrepresentation by the other party, the contract is voidable by the recipient, if the recipient was justified

in relying on said misrepresentation. *Id.* § 164.

### 2. Application

Here, the Schillings have raised a genuine issue of material fact as to whether the existence of fraud justifies rescission or reformation based on the alleged fraud of the FSA. Mark Schilling contends the FSA told him that the Section 31 farm would not have been included in the mortgages because it was only subject to a land contract and that he relied on this statement. *See Affidavit of Mark Schilling*, Defendants' Exhibit B, at 2, ¶ 6. Thus, when the Schillings signed the mortgage documentation, he assumed the reference to the Barkema land contract listed the section 31 *acreage* as security, and not the section 31 *farm*. *Id.* The Schillings further contend that had they understood the mortgage to include the section 31 farm property, instead of the section 31 acreage, they would not have manifested their assent to the terms of the mortgages. Stated differently, the Schillings relied upon the FSA's statement that the section 31 farm and other property purchased by virtue of a land contract would not be subject to the mortgages. The facts alleged, if proved, could supply justification for reformation or rescission of the 1997 and 1998 mortgages due to a unilateral mistake effectuated by fraud or misrepresentation. Consequently, taking the facts in a light most favorable to the Schillings, they have asserted facts sufficient to raise a genuine issue of material fact with respect to whether the 1997 and 1998 mortgages properly include the Section 31 farm property.

### III. CONCLUSION

For the aforementioned reasons, this court **denies** the plaintiff's Motion For Summary Judgment. Thus, as was the case in the *Lord of the Rings*, the journey of this lawsuit will have to be continued in a later chapter in order to affirmatively resolve the ownership dispute between the two parties regarding the Section 31 farm property.

Hopefully, for the sake of both this court and the parties involved, the journey traversed by the protagonist of the *Lord of the Rings*, dear Frodo, will prove much more daunting than what will ultimately be required to definitively resolve this dispute over the validity of the FSA's purported lien on the Section 31 farm parcel.

**IT IS SO ORDERED.**

**DATED** this 25th day of August, 2006.

_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA